UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


KRISTI L. BUCZYNSKI,

      Plaintiff,                  Civil Action No. 16-11751

          v.                District Judge Thomas L. Ludington
                              Magistrate Judge R. Steven Whalen

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Kristi Buczynski ("Plaintiff) brings this action under 42 U.S.C. §405(g),

challenging Defendant Commissioner's ("Defendant's") application for Disability Insurance

Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act.

The parties have filed cross-motions for summary judgment. Both motions have been

referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the

reasons discussed below, I recommend that Defendant's Motion for Summary Judgment

[Docket #21] be GRANTED, and that Plaintiff's Motion for Summary Judgment [Docket

#15] be DENIED.

## PROCEDURAL HISTORY

On July 8, 2013, Plaintiff applied for DIB and SSI, alleging disability as of June 1, 2010 (Tr. 176-186). Following the initial denial of benefits, Plaintiff requested an administrative hearing, held on December 8, 2014 (Tr. 36). Administrative Law Judge ("ALJ") Patrick MacLean presided. Plaintiff, represented by attorney John Wildeboer, testified (Tr. 40-66), as did Vocational Expert ("VE") Diane Regan (Tr. 66-70). On March 16, 2015, ALJ MacLean found that Plaintiff was not disabled (Tr. 22-29). On April 4, 2016, the Appeals Council denied review (Tr. 1-6). Plaintiff filed the present action on May 17, 2016.

## BACKGROUND FACTS

Plaintiff, born May 14, 1978, was 36 at the time of the administrative determination (Tr. 29, 176). She completed two years of college and worked previously as a bookkeeper, manager, scale operator, and transcriber (Tr. 236). She alleges disability due to migraine headaches, anxiety, depression, asthma, allergies, hypothyroidism, and low back and hip pain (Tr. 234).

### A. Plaintiff's Testimony

*Plaintiff's counsel prefaced his client's testimony by changing the alleged onset of disability date to October 1, 2011* (Tr. 38).

Plaintiff offered the following testimony:

She lived in a single-level house in Caseville, Michigan with her daughter, eight and

son, five (Tr. 41). Her son had Asperger's syndrome but was "high functioning" (Tr. 42). He did "pretty well" with dietary changes, special classes, and medication (Tr. 43). He was able to dress himself (Tr. 43).

Plaintiff experienced leg shaking when ascending the front porch steps to her house (Tr. 41). She was able to prepare meals, do laundry, and make short shopping trips but relied on her daughter to vacuum (Tr. 45-46). Her former husband did the yard work (Tr. 46). Plaintiff worked at home around 10 hours a week as a transcriptionist (Tr. 47). She made around five dollars an hour (Tr. 47). She worked at a pizza parlor for two months the previous summer before being terminated for her failure to keep up with the other staff members (Tr. 48).

Plaintiff became disabled in October, 2011 due to Grave's disease, migraines, and problems walking (Tr. 48). She was forced to undergo physical therapy to learn "to walk again" (Tr. 49). At present, she experienced leg weakness which was attributable to a January, 2009 hip injury (Tr. 49). She received current treatment for migraines and neck and back pain (Tr. 51). She took Toradol shots, Tramadol, and Cymbalta (Tr. 53). Despite medication, she experienced seven-and-a-half to eight-level pain on a ten-point scale (Tr. 55). She was unmotivated to continue psychological treatment for depression (Tr. 54). Her driving was limited to driving her children to the bus stop due to shaking in her hands (Tr. 51-52). She experienced sleep disturbances due to pain (Tr. 55). Her outings were limited to taking her children to the park occasionally in the summer (Tr. 52).

Plaintiff was unable to sit for more than 20 minutes or stand or walk for more than 15 at one time (Tr. 56-57). She was unable to lift more than 10 pounds without difficulty and experienced problems twisting bottle caps and gripping (Tr. 57-60). She experienced memory problems which required her to write out reminders for appointments (Tr. 58). She was able to do transcription work, pay bills, and look at Facebook online (Tr. 58). She was able to access the internet from her mobile phone (Tr. 59).

In response to questioning by her attorney, Plaintiff reported that she was unable to type for more than 20 minutes before experiencing hand numbness (Tr. 60). She used migraine medication approximately once a week at which time she experienced the side effects of dizziness and lightheadedness (Tr. 61). The headaches interfered with her transcription work approximately twice a month (Tr. 61). She lost the job at the pizza parlor due to problems gripping a pizza pan (Tr. 62). Nighttime sleep disturbances forced her to take daytime naps (Tr. 63). She required breaks every 20 minutes when performing household chores (Tr. 64).

## B. Medical Evidence

### 1. Treating Sources[1]

A November, 2005 MRI of the lumbar spine was negative for abnormalities (Tr. 382). A June, 2012 MRI of the brain and MRA of the carotid arteries were unremarkable (Tr. 394-

---

[1]Medical evidence pertaining to Plaintiff's condition prior to the amended alleged onset date of October 1, 2011 is included for background purposes only.

395).  A July, 2012 MRI of the lumbar spine showed only minimal degenerative changes (Tr. 393).  In August, 2010, endocrinologist Jamal Hammond, M.D. noted a diagnosis of hyperthyroidism with Grave's disease (Tr. 305).  Plaintiff declined a recommended course of radiation due to her need to take care of her children (Tr. 305).

Dr. Hammond's January, 2011 records note a reduction in symptoms from Tapazole (Tr. 306).  The same month, Plaintiff received a refill of Tylenol #3 for migraine headaches from Joanna Kala, D.O. (Tr. 315).  Plaintiff demonstrated full muscle strength despite a diagnosis of degenerative disc disease (Tr. 316).  In May, 2011, Dr. Kala administered a nerve block without complications (Tr. 318).  Plaintiff reported no improvement from physical therapy or chiropractic treatment (Tr. 320).  Dr. Kala observed a normal gait (Tr. 321).  The following month, Plaintiff reported an improvement in migraines from Topamax (Tr. 323).  Dr. Kala recommended increased dosages of Vitamin B-12 for increased energy (Tr. 326).

In July, 2011,  Joel DeGuzman, M.D. administered trigger point injections (Tr. 623).  Dr. Hammond's August, 2011 records note a recurrence of a small thyroid goiter and Plaintiff's report of fatigue and weight loss (Tr. 307).  The same month, Plaintiff reported good results from trigger point injections (Tr. 624).  She exhibited full muscle strength in all extremities (Tr. 624).  October, 2011 physical therapy records note Plaintiff's report that she was unable to lift more than 15 pounds or perform household and shopping chores (Tr. 646).  December, 2011 records by Dr. Kala note full strength in the upper extremities despite

Plaintiff's report of numbness associated with Carpal Tunnel Syndrome ("CTS") (Tr. 332). Dr. Kala prescribed wrist splints (Tr. 332). The same month, Sam Morkos, M.D. noted Plaintiff's report of lumbar spine pain and tenderness, recommending nerve blocks (Tr. 698-699).

EMG and needle conduction studies from February, 2012 showed "mild" right CTS (Tr. 335). Dr. Kala recommended the continued use of wrist splints (Tr. 335, 338-339). Plaintiff reported good results from Tramadol (Tr. 630). In March, 2012, Dr. Hammond opined that the hyperthyroidism was "getting under better control" (Tr. 308). The same month, Dr. Morkos administered a nerve block without complications (Tr. 718). Notes from the following month state that she did not require thyroid medication (Tr. 309). In May, 2012, Plaintiff reported only minimal symptoms of CTS (Tr. 340). The migraine headaches were deemed "stable" (Tr. 342). June, 2012 cardiac testing was unremarkable except for "mild" mitral regurgitation (Tr. 349-350, 463). Plaintiff reported that she did "light walking" for exercise (Tr. 350). Two nerve branch ablation procedures were performed without complications (Tr. 794, 840). In August, 2012, she received emergency treatment for a ruptured ovarian cyst (Tr. 357). Treating records note a normal gait (Tr. 359). Dr. Hammond's notes state that Plaintiff was "doing well" (Tr. 419). The following month, Dr. Morkos noted good results from the ablation treatment (Tr. 895). November, 2012 physical therapy discharge records note that Plaintiff reported no improvement in symptoms after a month of therapy (tr. 652).

Dr. Kala's December, 2012 treating records note Plaintiff's report of worsening CTS on the right (Tr. 343, 378). She reported that she was "not interested" in surgical intervention (Tr. 343). She also reported semimonthly migraine headaches (Tr. 343). She reported good results from recent physical therapy for lumbar spine problems (Tr. 344). She demonstrated full upper extremity strength (Tr. 345).

In January, 2013, Plaintiff sought emergency treatment for a migraine headache (Tr. 384, 400). A CT of the brain was negative for abnormalities (Tr. 386). Dr. Kala's notes from the following month show full strength in the upper extremities and a normal gait (Tr. 388, 456). January and February, 2013 nerve blocks were administered by Dr. Morkos, without complications (Tr. 396, 409). In March, 2013, Plaintiff reported up to 16 headaches each month (Tr. 392). The following month, she was prescribed six weeks of physical therapy (Tr. 395). In May, 2013, Plaintiff requested a reduction of her Prozac dosage (Tr. 457).

In July, 2013, Dr. Kala completed an assessment of Plaintiff's work-related abilities, finding that she was limited to lifting a maximum of 10 pounds and standing/walking for two hours in an eight-hour work day (Tr. 490). Dr. Kala found that she could push or pull without limitation but was required to alternate between a sitting and standing position (Tr. 490). Dr. Kala found that headaches would interfere with Plaintiff's job performance for two hours each day (Tr. 490). The following month, Dr. Morkos administered a nerve block (Tr. 491). Notes by Sherrie Hernisey, PA from the same month state that Plaintiff experienced

renewed depression, anxiety, and weight gain (Tr. 519).

In August, 2013, Dr. Hammond noted an unremarkable physical examination (Tr. 682). August, 2013 psychological intake records note the conditions of depression and anxiety (Tr. 494). Plaintiff reported that she currently did transcription work from her home but was "looking for other work" (Tr. 498). She was assigned a GAF of 60 with a diagnosis of anxiety and depression[2] (Tr. 502). Her functioning was deemed "mildly impaired" (Tr. 503). Treatment records from the following month and October, 2013 note depression and anxiety resulting from relationship issues (Tr. 504, 550-552).

In September, 2013, Ramsey Ross, M.D. remarked that Plaintiff had declined to follow her neurologist's advice for steroid injections for CTS (Tr. 522). He noted that Plaintiff was able to keyboard for "six-hour days . . . without difficulty and no limitations" (Tr. 522). Plaintiff denied lower extremity problems (Tr. 522). Dr. Ross noted that Plaintiff was able to walk "down the hall" without problems but when "asked to walk" in the examination room, she professed "difficulty doing so and [was] not very willing to do so" (Tr. 524). A neurological examination was unremarkable (Tr. 524). Dr. Ross noted the possibility of "some malingering" (Tr. 524). He found that she "would have no limitations on her ability to stand or sit at a job through the course of the day and have no lower

---

[2]A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. *Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* (4th ed.2000)("*DSM-IV-TR*").

extremity limitations" (Tr. 524).

In October, 2013, Dr. Morkos administered a lumbar nerve block (Tr. 543). Dr. Kala's November, 2013 records note Plaintiff's report of headaches two to three times each week (Tr. 507). Plaintiff also reported dizziness, memory problems, and an exacerbation of CTS (Tr. 507). Plaintiff reported that she was currently working 20 hours a week but asked to be excused from community work required for a cash assistance program (Tr. 508). A summary of her condition states that she experienced headaches 12 to 16 times a month (Tr. 509). Dr. Kala completed an assessment, finding that Plaintiff experienced right hand paralysis but was able to lift up to 20 pounds and stand/walk for six hours in an eight-hour workday (Tr. 514-515). She found that Plaintiff was precluded from repetitive fine manipulative activity (Tr. 514). Dr. Kala found no mental limitations (Tr. 515). PA Hernisey's treating records from the same week state that Plaintiff reported dizziness, hearing loss, shortness of breath, and tremors of the hands (Tr. 527). An EKG was normal (Tr. 530). Psychological counseling records note an improvement in mood (Tr. 553-554). Dr. Ross's notes from the following month note a normal mood and affect (Tr. 532).

In February, 2014 Plaintiff reported right hand numbness but that wrist splint helped the CTS symptoms (Tr. 512). Dr. Morkos' April, 2014 records note Plaintiff's report of radiculopathy of the lower extremities (Tr. 546). An x-ray of the left knee was unremarkable (Tr. 565). EMG and nerve conduction studies were normal (Tr. 605-608). Plaintiff denied medication side effects (Tr. 546). An MRI of the cervical spine from the same month

showed only "minor to mild" degenerative disc disease (Tr. 559, 603, 609-610). The following month an esophagogastroduodenoscopy with a biopsy was negative for malignancy but was consistent with mild chronic gastroesophageal reflux disease ("GERD") (Tr. 561-562, 567). The same month, Plaintiff reported that her migraine headaches were "under pretty good control" (Tr. 613). She exhibited full muscle strength in all extremities (Tr. 614). Dr. Kala's July, 2014 records state that Plaintiff was working part time at a pizza parlor (Tr. 615). An MRI of the lumbar spine showing only minor and mild disc degeneration was consistent with the 2009 study (Tr. 620).

August, 2014 physical therapy records note Plaintiff's report that "headaches limit activity occasionally" (Tr. 568). She exhibited normal balance (Tr. 571). She reported good results from physical therapy (Tr. 581). Later the same month, Plaintiff reported "a lot of pain" after being required to stand "for eight hours straight" at work (Tr. 587). Notes from the following day state that Plaintiff sat "at a computer for one of her jobs" which "encourage[d] poor posture . . ." (Tr. 597). The following week, Plaintiff reported that she no longer worked at her second job (pizza parlor) (Tr. 598). Dr. Kala's September, 2014 records note that the frequency of headaches had lessened (Tr. 687-688, 939-940). Plaintiff reported nine positive tender points (Tr. 690). PA Hernisey's November, 2014 notes state that Plaintiff reported a recent diagnosis of fibromyalgia by Dr. Kala with a prescription for Cymbalta (Tr. 930). In December, 2014, Dr. Kala noted Plaintiff's report that her headaches were "much improved" with two headaches a week that did "not last long" (Tr. 943).

Plaintiff reported that myofascial pain "waxed and waned" (Tr. 943). She exhibited full

muscle strength and reported reduced cervical spine pain (Tr. 944).

## 2. Non-Treating Sources

In February, 2013, Michael Brady, Ph.D. performed a consultative psychological

examination on behalf of the SSA, noting Plaintiff's report of a number of physical

conditions and lack of motivation (Tr. 373). She reported good relationships with her mother

and a couple of close friends (Tr. 374). She reported that she was able to care for herself,

perform household tasks, and care for her children (Tr. 374). She exhibited a normal stream

of activity but appeared mildly depressed (Tr. 373-375). Dr. Brady diagnosed her with major

depression with a "fair" ability to concentrate (Tr. 376). He assigned her a GAF of 60,

noting she was capable of handling workplace stressors appropriately (Tr. 376).

In October, 2013, Joe DeLoach, Ph.D. performed a non-examining assessment of

Plaintiff's psychological limitations on behalf of the SSA, finding that she experienced only

mild limitation in activities of daily living, social functioning, and concentration, persistence,

or pace (Tr. 81-82).

## C. Vocational Expert Testimony

VE Diane Regan classified Plaintiff's past relevant work as a bookkeeper as skilled

and sedentary and work as a scale operator, semiskilled/light[3] (Tr. 286). The ALJ posed the

---

[3]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds
at a time and occasionally lifting or carrying articles like docket files, ledgers, and small
tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or

following set of limitations to the VE, describing a hypothetical individual of Plaintiff's age, education, and past relevant work:

> [A]ssume a person . . . who is able to lift up to 20 pounds occasionally or lift or carry up to 10 pounds frequently and light work as defined by the regulations, no climbing ladders, ropes or scaffolds . . . occasionally climb ramps or stairs, occasionally balance, stoop, crouch, kneel and crawl. Occasionally handle and finger objects bilaterally and whose work could be limited to simple, routine, repetitive tasks due to her depression and anxiety and the medications that she takes for those. Can an individual with these limitations perform Claimant's past relevant work as Claimant performed it or as customarily performed? (Tr. 67).

The VE testified that given the above limitations, the individual would be unable to perform Plaintiff's past relevant work due to the restriction to occasional fingering and handling (Tr. 67). She found that the individual could perform the light exertional work of a grader (100,000 positions in the regional economy) (Tr. 68). She testified that if the same individual were limited to sedentary work with a sit/stand "at will" option, she could perform the job of surveillance system monitor (600) (Tr. 68). The VE stated that if sit/stand option were limited to a change of position every 20 minutes, all work would be eliminated[4] (Tr. 69). In

---

carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

[4] The VE's testimony that a sit/stand option "at will" would allow for work as a surveillance system monitor but that sit/stand option allowing position changes only every 20 minutes would eliminate all work appears to be based a misunderstanding of the ALJ's question. Allowing the hypothetical individual to change positions "at will" (as found in the

response to questioning by Plaintiff's counsel, the VE testified further that if the same individual were absent two days a month due to pain and migraine headaches, all work would be eliminated (Tr. 70). The VE stated that her testimony was consistent with the information found in the *Dictionary of Occupational Titles* ("*DOT*") except for the testimony regarding the sit/stand option which was based on her own professional experience (Tr. 70).

### D.    The ALJ's Decision

Citing the medical record, the ALJ found that Plaintiff experienced the severe impairments of "generalized anxiety disorder, right sacroiliac disease, bilateral carpal tunnel syndrome, fibromyalgia, obesity and lumbar spondylosis" but that none of the conditions met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 23). He found that Plaintiff experienced mild limitation in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace (Tr. 23-24). The ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") for sedentary work with the following non-exertional limitations:

> [S]it/stand at will every 20 minutes; no climbing ladders, ropes or scaffolds; occasional climbing ramps or stairs; occasional postural activities including balancing, stooping, crouching, kneeling, crawling; occasional handling, that is gross manipulation; occasional fingering, that is fine manipulation of objects no smaller than a paperclip; and, work requiring the mental capacity to

---

original hypothetical question) represents a greater workplace restriction than limiting the position changes to once every 20 minutes. *See* SSR 96-9p, 1996 WL 374185,*7 (July 2, 1996)(imposition of a sit/stand "at will" requirement in the hypothetical question represents the most restrictive of all the sit/stand limitations). Plaintiff has not argued that this discrepancy constitutes reversible error.

perform simple, routine and repetitive tasks (Tr. 24).

Citing the VE's testimony, the ALJ found that Plaintiff could perform the job of a surveillance system monitor (Tr. 29).

The ALJ discounted Plaintiff's allegations of disability (Tr. 20-21). The ALJ noted that Plaintiff was able to perform household chores, hold down a part-time job, and care for two children, "one of whom is slightly autistic" (Tr. 26). He cited neurological treating notes stating that the symptoms of CTS were "mild" (Tr. 26). He found that symptoms of depression and anxiety were accounted for by the RFC for "simple, routine and repetitive tasks" (Tr. 28).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into

account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATION

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### A. The Residual Functional Capacity Assessment

Plaintiff argues first that RFC composed by the ALJ did not reflect her limitations resulting from migraine headaches, limitations in fine manipulation, medication side effects, or concentrational deficiencies. *Plaintiff's Brief,* 5-12, *Docket #15,* Pg ID 1004.

"RFC is what an individual can still do despite his or her limitations." SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996). "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts" including objective findings, non-medical evidence, and activities of daily living. *Id.* at 7. The analysis must include the non-exertional limitations. 20 C.F.R. § 404.1545. However, "'[a]lthough a function-by-function analysis is desirable, SSR 96–8p does not require ALJs to produce such a detailed statement in writing.'" *Delgado v. Commissioner of Social Sec.,* 30 Fed.Appx. 542, 547–548, 2002 WL 343402, *5 (6th Cir. March 4, 2002)(*citing Bencivengo v. CSS,* 251 F.3d 153, slip op., 4 (Table)(3rd Cir. December 19, 2000)(punctuation added). "'[T]he ALJ need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record.'" *Id.* (*citing Bencivengo* at slip op. at 5).

### 1. The Migraine Headaches

The omission of the condition of migraine headaches from the severe impairments at Step Two of the administrative analysis, with nothing more, does not amount to reversible error. *See Fisk v. CSS,* 253 Fed.Appx. 580, 583, 2007 WL 3325869, *4 (6th Cir.November 9, 2007)(*citing Maziarz v.HHS*, 837 F.2d 240, 244 (6th Cir.1987)(So long as "an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, an ALJ's failure to find" that a condition is not severe "at step two 'does not constitute reversible error'"). Likewise here, while the evidence strongly supports that the condition of migraine headaches caused some degree of work-related limitation, the latter portion of the ALJ's analysis adequately addressed Plaintiff's allegations, the applicable medical records, and his reasons for discounting Plaintiff's alleged degree of limitation.

First, the ALJ discussed Plaintiff's allegations of disabling migraines (Tr. 25). He acknowledged that she took Imitrex and Toradol injections for the condition and her allegations that the medication respectively caused dizziness and the feeling of being "high" (Tr. 25). The ALJ noted the claim that the condition interfered with her work twice a month and required her to recline for an hour after taking medication (Tr. 25). However, the ALJ also observed that despite Plaintiff's allegations of "headaches and neck pain," the treating notes showed that the frequency of the headaches had been reduced with treatment (Tr. 27). He noted that despite the allegations of disabling headaches, an MRI of the cervical spine showed only mild degenerative changes (Tr. 26).

Plaintiff's related argument that the RFC did not account for limitations resulting from the migraine headaches is not well taken. First, the omission of reference to the condition in the RFC does not constitute error. *Webb v. CSS*, 368 F.3d 629, 633 (6th Cir. 2004)(hypothetical questions to vocational experts, and by extension, the RFC found in the administrative opinion, need not "include a listing of medical conditions" so long as it reflects the claimant's limitations). Second, under SSR 96-8p, the ALJ provided an adequate discussion of his reasons for finding that the condition did not prevent Plaintiff from performing sedentary, unskilled work. The ALJ noted that despite the condition of migraine headaches, Plaintiff was able to care for her children on a continuing basis, perform household tasks, and work part time. To be sure, her report of migraine-related interruption the majority of workdays each month (as found in a July, 2013 treating assessment) would point to a disability finding. However, the ALJ correctly noted that the medical records created subsequently show that the frequency and severity of migraines dramatically lessened. September, 2013 records show that Plaintiff was able to keyboard for "six-hour days . . . without difficulty and no limitations" and was able to work 20-hour weeks as of December, 2013 (Tr. 508, 522). May, 2014 records state that the migraine headaches were "under pretty good control" (Tr. 613). Substantial evidence supports the ALJ's finding that the migraine headaches did not create greater limitations than those found in the RFC (limited to the "mental capacity to perform simple, routine and repetitive tasks") for a 12-month period or longer (Tr. 24). 42 U.S.C. § 423(d)(1)(A).

## 2. The Manipulative Limitations

Substantial evidence also supports the RFC for occasional manipulative activity. The ALJ noted that EMG and nerve conduction were negative for median neuropathy or cervical radiculopathy and that Dr. Kala described the CTS as mild (Tr. 26, 335). Plaintiff's assertion that Dr. Kala found that she was "unable to perform fine manipulation" with either hand is incorrect, given that the form completed refers to *repetitive actions* rather than the complete inability to perform any fine manipulations (Tr. 514). Plaintiff's claim that the ALJ "acknowledge[d]" the preclusion on all fine manipulative activity likewise misstates the ALJ's findings, which accurately note that Dr. Kala found that Plaintiff "had some difficulty with fine manipulation . . ." (Tr. 27). The RFC restriction to occasional manipulative functioning which limits such activity to no more than one-third of the workday (as opposed to frequent or constant activity) reflects Dr. Kala's conclusion that Plaintiff is unable to perform repetitive fine manipulative actions. Notably, Plaintiff does not claim that the position of security surveillance monitor (as found by the VE in support of the Step Five finding) requires repetitive or more than occasional fine manipulation. Last but not least, Plaintiff's acknowledged ability to work part-time as a transcriptionist (a job relying almost exclusively on fine manipulative functioning) stands grossly at odds with her claim that she is incapable of occasional manipulative activity.

### 3. Side Effects of Medication and Concentrational Limitations

As required by 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3), the ALJ also addressed the alleged medication side effects and concentration problems. The hypothetical question forming the basis of the RFC included a limitation to unskilled work as a result of "depression and anxiety and the medications that she takes for those" (Tr. 67). In the administrative decision, the ALJ acknowledged Plaintiff's claim that "Imitrex makes her dizzy[,] Toradol gives her a high" and the accompanying claim that she was required to lie down for one hour after taking medication and required daily naps (Tr. 25). Despite the allegations of extreme limitation, the ALJ reasonably found that the claims of disabling medication side effects and extreme psychological limitation were undermined by her ability to perform "all household chores including cleaning, laundry and cooking, while at the same time holding down a part-time job and being a mother to two young children, one of whom is slightly autistic" (Tr. 26). He found that limitations in concentration resulting for depression, anxiety, and pain were addressed by a limitation to "simple, routine and repetitive tasks" (Tr. 28).

The evidence of record otherwise supports the ALJ's summation and conclusion that Plaintiff could perform "simple, routine and repetitive tasks" despite some degree of psychological limitation. Multiple treating records suggest that Plaintiff was able to work at least 20 hours a week without psychological disturbance (Tr. 508, 522). The GAF of 60 (suggesting at most moderate psychological limitation) is adequately addressed with the RFC

for unskilled work and the hypothetical modifiers of limitations brought about by anxiety and depression. *See Smith–Johnson v. CSS,* 579 Fed. Appx. 426, 437, 2014 WL 4400999, *10 (6th Cir. September 8, 2014)(moderate concentrational limitations in carrying out detailed instructions and maintain attention and concentration for extended periods adequately addressed by restricting the claimant to unskilled, routine, repetitive work); *Despain v. CSS*, 2014 WL 6686770, *12 (E.D. Mich. November 26, 2014)(same); *Lewicki v. CSS,* 2010 WL 3905375, *2 (E.D. Mich. Sept. 30, 2010) (the modifiers of "simple routine work" adequately accounted for the claimant's moderate concentrational deficiencies).

While Plaintiff argues that the condition of anxiety requires additional modifiers, the VE's job findings were based on a hypothetical question restricting her to unskilled work as a result of "depression and anxiety and the medications that she takes for those" (Tr. 67). Further, the ALJ noted that the condition did not prevent Plaintiff from engaging in a wide variety of activities including part-time work and child care. Notably, while Plaintiff testified that she was terminated from a pizza parlor position after only two months' work, she reported that she was fired as a result of problems gripping a pizza pan rather than because of anxiety (Tr. 62). None of the evidence supports her claim that the condition of anxiety would prevent her from performing simple, routine, and repetitive tasks. Likewise, while Plaintiff argues that the "simple, routine, and repetitive" modifiers do not address her "pacing" limitations resulting from anxiety, she does not explain how pacing deficiencies would come into play performing the job of surveillance system monitor. Given that the

hypothetical question made reference to the conditions of anxiety and depression and medication side effects, Plaintiff is hard put to claim that the Step Five conclusion omitted consideration of these conditions (Tr. 67). Moreover, Plaintiff's puzzling assertion that the modifiers of "simple, routine and repetitive" reflect "skilled work," *Plaintiff's Brief* at 10, is wholly contradicted by the applicable Regulations. *See* SSR 85–15, 1985 WL 56857, *4 (1985)(unskilled work defined as "simple" and "routine" ).

### B. Dr. Kala's Treating Opinions[5]

Plaintiff argues next that the ALJ did not provide an adequate rationale for declining to adopt either Dr. Kala's July or November, 2013 treating assessments.[6] *Plaintiff's Brief* at 12-15. In particular, Plaintiff asserts that Dr. Kala's November, 2013 assessment supports the finding that she is incapable of even sedentary work. *Id.* at 14 (*citing* Tr. 14). On a related note, Plaintiff argues that the ALJ erred by relying on his own interpretation of the "raw medical data" instead of incorporating Dr. Kala's treating opinions into the RFC. *Plaintiff's Brief* at 15-16. She contends that the opinion of Dr. Kala, a neurologist, was "in the best position to determine the RFC . . ." *Id.* at 16.

The failure to articulate "good reasons" for rejecting a treating physician's opinion constitutes reversible error. *Gayheart v. CSS*, 710 F.3d 365, 376 (6th Cir. 2013). "[T]he

---

[5]Plaintiff's argument that the ALJ did not articulate his reasons for "rejecting" Dr. Kala's findings (second argument) and, that the ALJ erred by failing to adopt Dr. Kala's findings in the RFC (third argument) can be considered in tandem.

[6]Plaintiff's argument misstates the assessment dates as November, 2012 and July, 2013. *Plaintiff's Brief* at 12.

Commissioner imposes on its decision-makers a clear duty to 'always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart*, at 376 (citing SSR 96–2p, 1996 WL 374188, *5 (1996)).

Plaintiff's argument is undermined by the fact that the ALJ actually adopted most of Dr. Kala's findings in the RFC. First, Plaintiff contends specifically that Dr. Kala's November, 2013 assessment states that she was incapable of any sitting. *Plaintiff's Brief* at 14 (*citing* Tr. 514). This argument is without merit. In reality, Dr. Kala did not complete the portion of the assessment related to sitting which consisted of check boxes for sitting of either less than six hours a day or "about" six hours a day (Tr. 514). The ALJ accurately noted that the assessment "did not indicate [Plaintiff's] capacity for sitting" (Tr. 27). There is no support for Plaintiff's argument that Dr. Kala's failure to fill out that portion of the form implies the total inability to sit. The records as a whole do not otherwise suggest that Plaintiff was unable to sit for six hours a day with a sit/stand option as stated in the RFC. Plaintiff's argument on this point is further weakened by the fact that the ALJ adopted Dr. Kala's July, 2013 finding that she would be capable of work where she could change position as needed (Tr. 24, 490).

Moreover, the one instance where the ALJ declined to adopt Dr. Kala's findings is well supported and explained. The ALJ rejected Dr. Kala's finding that 16 migraines a month which would disrupt Plaintiff's work schedule approximately two hours a day (Tr. 27, 490). He noted that Dr. Kala's subsequent records showed that the headaches declined in frequency (Tr. 27). While Plaintiff complains that the ALJ's rationale did not constitute "good reasons," the determination, as noted above, is supported by the record showing that the migraines were significantly reduced in frequency by the end of the same year (Tr. 507) and "under pretty good control" by the first half of the following year (Tr. 613). Plaintiff's related argument that the ALJ did not consider all of the applicable factors to be weighed when rejecting a treating source opinion is also without merit. In explaining the reasons for giving less than controlling weight to a treating physician opinion, the ALJ must consider (1) "'the length of the...relationship" (2) "frequency of examination," (3) "nature and extent of the treatment," (4) the "supportability of the opinion," (5) "consistency...with the record as a whole," and, (6) "the specialization of the treating source." *Wilson v. CSS*, 378 F.3d 341, 544–546 (6th Cir. 2004); 20 C.F.R. § 404.1527(c). The record shows that the ALJ considered all of the these factors: The ALJ cited Dr. Kala's treating records predating the amended alleged onset date of October 1, 2011 and forward showing that Plaintiff sought frequent treatment before and after that date (Tr. 26). He noted that the treating records were accompanied by imaging studies (Tr. 26-27). The ALJ acknowledged that Dr. Kala was a neurologist (Tr. 26). He adopted Dr. Kala's findings in total with the exception of her

finding that Plaintiff experienced long-term, disability-level headaches by correctly noting that the subsequent records showed an improvement in the condition. As such, the ALJ's well supported and explained rejection of one of Dr. Kala's findings does not constitute error.

For identical reasons, Plaintiff's argument that the ALJ erroneously relied on "raw medical data," and nothing more to support the RFC is unfounded. *Plaintiff's Brief* at 15-17, First, the ALJ did not err in drawing on the record as a whole as well as Dr. Kala's opinion in crafting the RFC. *See* 20 C.F.R. § 404.1527(d)(2)(determination of the RFC is reserved to the Commissioner). While Plaintiff revisits the claim that Dr. Kala found that she was incapable of *all* sitting, this finding, as discussed above, is contradicted by the record as a whole as well as the assessment. With nothing more, Plaintiff's ability to sit while transcribing for several hours a week defeats this claim.

Plaintiff's citation to an earlier Single Decision Maker's ("SDM's") finding that she was capable of exertionally light work is confusing. Plaintiff is correct that SDM findings do not constitute medical evidence. *See Stratton v. Astrue*, 987 F.Supp.2d 135, 147–148 (D.N.H.2012)(reliance on the opinion of an SDM rather than a medical expert intrinsically improper); *Lindsey v. CSS,* 2013 WL 6095545, *6 (E.D.Mich. November 20, 2013)(same). However, there is no indication that the ALJ relied directly or indirectly on the SDM findings that she could perform light work (Tr. 83-84). The SDM's findings that Plaintiff could lift up to 20 pounds and did not experience any manipulative limitations bears little resemblance

to the ALJ's finding that Plaintiff was limited to sedentary work with a sit/stand option and occasional manipulative activity (Tr. 24, 83-84). The RFC, with the exception of Dr. Kala's finding of disabling migraines, reflects the treating neurologist's opinion.

The Court also notes that Plaintiff does not present a particularly strong case for benefits. The plethora of clinical testing results found in the present transcript show almost exclusively normal, minimal, or at most mild abnormalities (Tr. 309, 335, 349-350, 386, 393, 321, 522, 624). At least one source found evidence of "some malingering" (Tr. 524). The RFC for a limited range of sedentary work reflects a generous account of Plaintiff's limitations and as such, does not warrant of remand for further fact-finding or an award of benefits.

Because the determination that Plaintiff was capable of performing a significant range of work is well within the "zone of choice" accorded to the fact-finder at the administrative hearing level, it should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment [Docket #21] be GRANTED, and that Plaintiff's Motion for Summary Judgment [Docket #15] be DENIED. Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985);

*Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: June 15, 2017

## CERTIFICATE OF SERVICE

I hereby certify on June 15, 2017 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to the non-registered ECF participants on June 15, 2017.

s/Carolyn M. Ciesla
Case Manager for the
Honorable R. Steven Whalen
